2026 IL App (1st) 260166-U
No. 1-26-0166

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

_____

| | | |
|---|---|---|
| IN THE INTEREST OF: <br> H.C., | ) <br> ) <br> ) | Appeal from the Circuit Court <br> of Cook County, Illinois, <br> Child Protection Division |
| Minor-Respondent-Appellee | ) <br> ) | |
| (PEOPLE OF THE STATE OF ILLINOIS, | ) <br> ) | No. 25 JA 00124 |
| Petitioner-Appellee, | ) <br> ) | |
| v. | ) <br> ) | |
| Angel C., | ) <br> ) | The Honorable <br> Patrick T. Murphy, |
| Respondent-Appellant.) | ) | Judge Presiding. |

_____

JUSTICE PUCINSKI delivered the judgment of the court.
Justices Hyman and Gamrath concurred in the judgment.

**ORDER**

¶ 1     *Held*: We affirm the circuit court's adjudication order finding that respondent's minor child was neglected due to an injurious environment as well as the subsequent disposition order finding that respondent was unable and unfit to parent the minor.

¶ 2     Respondent-appellant Angel C. ("respondent") appeals from the circuit court's December 11, 2025 adjudication order finding his child, minor-respondent-appellee H.C., neglected due to an injurious environment under section 2-3(1)(b) of the Juvenile Court Act of 1987 ("Act"). 705

ILCS 405/2-3(1)(b) (West 2022). Respondent further appeals from the January 15, 2026 disposition order that adjudged H.C. a ward of the court and found respondent unfit and unable to care for the minor. For the following reasons, we affirm the circuit court's orders.

¶ 3                                    BACKGROUND

¶ 4     Respondent is the father of H.C., a girl born in September 2020. H.C.'s natural mother, Alexis G., is not a party to this appeal. The record reflects that the mother has a history of schizophrenia and substance abuse issues. During the time frame relevant to this appeal, respondent and mother were already separated, and the mother was not involved in caring for H.C. H.C. resided in respondent's Chicago residence until she was taken into DCFS custody in February 2025.

¶ 5     The record reflects that respondent had a girlfriend, Maia Hunwick-Bailey (Maia), who sometimes resided with respondent. Maia and respondent are also the parents of a younger child, although the underlying proceedings relate only to H.C.

¶ 6      On November 15, 2024, Maia found respondent unconscious outside the front of his residence in Chicago. H.C., who was then four years old, was sleeping in the home. Emergency responders treated respondent with Narcan for an accidental heroin overdose, and he was later hospitalized.

¶ 7     In early December 2024, respondent was incarcerated. The record does not specify the precise underlying offenses, although his counsel in this matter indicated to the trial court that he was imprisoned for methamphetamine possession.[1] Respondent remained incarcerated during the remainder of the proceedings at issue in this appeal.

---

[1] According to the results of an "inmate search" inquiry on the Illinois Department of Corrections (IDOC) website, respondent is serving seven-year sentences for possession of methamphetamine and aggravated unlawful use of a weapon.

¶ 8     On January 2, 2025, respondent executed an "Appointment of Short-Term Guardian" form pursuant to section 11-5.4 of the Probate Act of 1975 that designated Maia as the minor's legal guardian for a period of one year. See 755 ILCS 5/11-5.4 (West 2024). Maia signed the form to indicate her acceptance of the appointment. The validity of that appointment is not in dispute. Notably, however, the State and DCFS did not learn of Maia's appointment as short-term guardian until after the underlying proceedings were initiated.

¶ 9     On February 19, 2025, the State filed a petition for adjudication of wardship alleging that H.C. was neglected due to an injurious environment (705 ILCS 405/2-3(1)(b) (West 2022)) and alleging that she was abused due to a substantial risk of injury (*id*. §2-3(2)(ii)). In its petition, the State alleged as follows:

> "Mother has four and father has two prior indicated reports for substantial risk of physical injury/environment injurious to health and welfare by neglect. This minor resides with father. This family was previously offered intact services. Per the former caseworker, father supervises mother's visitation with this minor due to her untreated mental health issues. Mother has previously been diagnosed with schizophrenia. On November 15, 2024, father was found unconscious. This minor was present during this incident. Father was transported to the hospital for further treatment. Per medical personnel, father admitted to using illegal substances prior to losing conscious[ness]. Father refuses to cooperate with DCFS'[s] attempts to put services in place. DCFS has been unable to contact mother."

Also on February 19, 2025, the State moved for temporary custody of H.C.

¶ 10    In an "Affidavit Documenting DCFS Efforts" filed the same date, DCFS investigator Ethan Bolin explained that respondent had sole custody due to the mother's "mental instability." Bolin averred that respondent was revived with Narcan after an opioid overdose on November 15, 2024. Bolin further stated that respondent's "drug test came back adulterated, raising concerns that he attempted to manipulate the results."

¶ 11    According to Bolin's affidavit, respondent was uncooperative with DCFS, "refusing to engage in services." Thus, DCFS was considering placing the minor outside of respondent's care "or requesting court orders for him to engage in substance abuse treatment, parenting classes, and other necessary services."

¶ 12    On February 21, 2025, the court placed the minor with David L. Fox, the DCFS Guardianship Administrator, with the right to place the minor. Shortly thereafter, H.C. was placed with a foster parent, a cousin of respondent; the record reflects that H.C. subsequently was placed with a maternal relative.

¶ 13    Sometime after the February 2025 petition, DCFS learned that Maia was H.C.'s appointed legal guardian. On March 4, 2025, the court entered an order permitting Maia to have limited visitation with H.C.  The court directed the parties to participate in mediation, including the natural parents and Maia.

¶ 14    On April 23, 2025, the parties filed a mediation report and agreement among DCFS, the minor's natural parents, Maia, and the minor's foster parent. It reflected that Maia was visiting the minor at the foster parent's residence a few times per week, and that DCFS would assess whether she could have unsupervised visits. DCFS, the foster parent, and Maia agreed to work together to

schedule an autism assessment for H.C. and to obtain speech therapy and occupational therapy for her.

¶ 15   On May 20, 2025, the parties participated in another mediation session and filed corresponding agreements with the court. Maia agreed to participate in recommended services, a domestic violence assessment, and a substance abuse assessment. The parties agreed that Maia would have weekly supervised visits with the minor. Respondent agreed that he was recommended for individual therapy, substance abuse assessment, parenting classes and coaching, a domestic violence assessment, and a psychiatric evaluation.

¶ 16                                    Adjudication Hearing

¶ 17   The adjudication hearing was initially scheduled for July 2025, but it was postponed due to a dispute about certain of the mother's medical records. The adjudication hearing commenced on December 8, 2025.

¶ 18   At the beginning of the hearing, the court admitted medical records for the mother, respondent's medical records from his November 15, 2024 overdose, as well as police body-worn camera footage from the incident.

¶ 19   DCFS caseworker Kimberly Herring testified that the family's case had been opened in November 2022, and she became the family's caseworker in July 2023. DCFS recommended mental health and domestic violence services for the mother. The mother had begun them but then told Herring that she no longer wished to participate.

¶ 20   As to respondent, the agency had recommended perpetrator domestic violence services and parenting services. Respondent had enrolled in perpetrator domestic violence services but stopped participating in July 2023. Herring did not recall whether respondent had completed the recommended parenting classes.

¶ 21    Herring testified that she stopped working with the family in January 2024, when the case closed. She explained the case closed at that point because respondent had obtained custody of H.C. through a court order, and "[t]he parents no longer wanted to participate" in recommended services. On cross examination, Herring acknowledged that no court had ordered respondent to do parenting classes or domestic violence services.

¶ 22    DCFS investigator Ethan Bolin testified that he was assigned to the family after a "hotline call" in November 2024. When Bolin first spoke to respondent, respondent denied that he had overdosed. Respondent said he had a "medical condition" but "would not elaborate further." Bolin subsequently learned through the EMS report, police report, and hospital records that respondent had in fact overdosed.

¶ 23    Bolin recalled he spoke to respondent over the phone in January 2025, at which time respondent told him he was outside Chicago and would not return for a few months. Respondent did not reveal to Bolin that he was incarcerated. Respondent told Bolin that H.C. was in the care of her grandmother, respondent's mother. After Bolin unsuccessfully attempted to contact the grandmother, he eventually learned that the child was staying at respondent's home with Maia. He went to the respondent's home in January 2025 to check on the minor. Bolin met Maia, who "would not provide any information about who she was" but allowed Bolin to see H.C. Bolin recalled the minor looked well and had no signs of injury.

¶ 24    The court asked Bolin to explain why the agency sought to remove the child in February, if the child looked well taken care of. Bolin explained that respondent was "being evasive" and had given no information about who the child was staying with. Only after DCFS took custody in February 2025 did the agency learn that respondent was incarcerated and had "signed over a short-term guardianship to Maia."

¶ 25    Bolin testified that the agency considered giving the child back to Maia but determined not to do so based on Maia's prior history: "She had a prior indicated report. And then there was also multiple reports with her being present at the home," including a "domestic report" the same day as respondent's November 2024 overdose.

¶ 26    Bolin also testified that Maia helped conceal the fact that respondent was incarcerated when Bolin spoke to him by phone. He explained that Maia would answer respondent's cell phone when Bolin called, after which she would call respondent in jail and bring respondent into the conversation: "[L]ater I found out that Maia was answering the call, and she was three-waying him into the line."

¶ 27    On questioning by the Public Guardian, Bolin stated that he met respondent only once in November 2024, after which he spoke with him by phone. Until February 2025, respondent never mentioned that he was incarcerated. In response to a question from the court, respondent's counsel stated that he was incarcerated on "possession of meth" and was scheduled to be released in May 2028.

¶ 28    On cross-examination by respondent's counsel, Bolin agreed he could have taken custody of the minor in November 2024 but did not. At that time, H.C. appeared to be well cared for and showed no signs of abuse or neglect. Bolin said he offered respondent services multiple times, but he refused. Bolin agreed that when DCFS took protective custody in February 2025, H.C. was in Maia's care, and the minor showed no signs of abuse or neglect. Bolin testified he was never in contact with the minor's mother.

¶ 29    On questioning by Maia's counsel, Bolin acknowledged that earlier on the date of respondent's overdose, police were called to the home based on a verbal altercation involving respondent and Maia. Bolin's knowledge of this incident was based on a police report.

¶ 30    On redirect examination, Bolin testified that in November 2024, the agency did not yet have information to confirm that respondent had overdosed on drugs. After the agency gathered evidence confirming the overdose, Bolin told respondent in January 2025 that the agency recommended he participate in drug testing and drug treatment services. Respondent declined.

¶ 31    Maia testified that she is 26 years old and has two children, including a one-year-old with respondent and an eight-year-old from a prior relationship. She also testified that she helped to care for H.C. since she was about two years old. Maia testified she had an "on-and-off" relationship with respondent. At times Maia lived with respondent, but she sometimes resided with her mother. At the time of the hearing, she was residing with her children at respondent's residence.

¶ 32    Maia testified she was not present when the respondent overdosed on November 15, 2024, but she had been there a short time earlier. She had gone to respondent's residence that day to pick up her clothes, as she had decided to go back to live with her mother. Maia denied that there was a domestic violence incident with respondent that morning. However, she called the police because respondent was not answering the phone, and she needed to get into the residence to pick up her clothes. Eventually, respondent did answer the door. Maia told the police she was fine, retrieved her clothes, and left. On questioning by the court, she said she had decided to move back in with her mother at that point in November 2024 because respondent "had a different situation going on" with another woman.

¶ 33    Maia recalled that respondent was incarcerated beginning on or about December 5, 2024. She admitted that while respondent was incarcerated, she helped connect him to calls from DCFS.

¶ 34    Maia explained that after respondent was incarcerated, they executed a temporary guardianship form so that she could participate in meetings pertaining to H.C.'s individualized education program (IEP). Maia took care of H.C. when respondent was incarcerated. She

acknowledged that when DCFS caseworker Bolin visited the residence to check on H.C., she refused to "giv[e] him my information" because she "wanted to stay out of it."

¶ 35    After DCFS took H.C. away, Maia said she contacted DCFS about being a foster parent and showed them that she was appointed as guardian, but they "said that was not good enough." Maia was told that she could not foster H.C. because of a prior indication in her background.

¶ 36    On cross-examination, Maia admitted that during January and February 2025, she had three-way conversations between Bolin from DCFS and respondent while he was in jail. She never told Bolin that respondent was incarcerated.

¶ 37    Elsewhere on cross-examination, Maia testified that when she left respondent's residence after getting her clothes, respondent was sitting outside. About five minutes later, she came back because she forgot something; she then found respondent passed out and laying on his back.

¶ 38    Maia testified that while she was legal guardian, she took H.C. to school and appointments, made sure she was well-fed, and arranged for contact with respondent. Maia stated that she loved H.C. and desired to have custody of her.

¶ 39    After the conclusion of witness testimony but before argument, the court commented that it appeared that respondent had a "plan" for H.C.'s care after he was incarcerated and questioned:

> "[T]he young lady here, Ms. Maia, and the worker testified ***
>
> that hey, the kid looked well cared for. I'm saying why did you
>
> take the kid then if the kid was well cared for?"

¶ 40    The court reconvened for argument on December 11, 2025. The court commented it viewed the inquiry as whether respondent made the "correct decision" in placing H.C. in Maia's care as a temporary guardian. It asked: "Did he do the right thing in appointing her and did that relieve him of any neglect?"

¶ 41    The State responded that it was not appropriate for respondent to appoint Maia as temporary guardian since there was an "ongoing investigation" and a guardianship appointment "is not intended to subvert the investigation." The court commented that it believed it was a "pretty good decision" by respondent to place H.C. in Maia's care, since he knew she was a "very good person."

¶ 42    The Public Guardian agreed with the State that there were grounds for neglect, noting that Maia was not appointed as H.C.'s guardian "until two or three weeks after [respondent] went to jail. So if he was actually trying to mitigate and think about [H.C.], it should have been when he got arrested on December 5th."

¶ 43    During respondent's argument, the court remarked that respondent eventually "did the right thing" but noted that the State decided to file a petition "because there was neglect, even though the father made a correct decision after the neglect." When respondent's counsel argued there was no proof of neglect "at any time," the court asked: "What about the father lying on the stoop with drugs and then being in county jail and unable to care for the child?"

¶ 44    The State subsequently argued that (regardless of whether Maia was an appropriate caregiver) the minor was clearly neglected during respondent's drug overdose on November 15, 2024, when respondent was the only person caring for H.C. The State noted that Maia was not yet appointed as a legal guardian at that time.

¶ 45    The State also argued that Maia "left this child with a drug-using father alone on November 15th" which was relevant to whether she could protect the child. The State also noted that Maia later helped conceal the fact that respondent was incarcerated, and that Maia did not disclose that she was an appointed guardian when Bolin checked on the minor.

¶ 46    The State indicated its position was that the child was neglected on the date of the overdose, which was not "negated" by the respondent's subsequent decision to appoint Maia as temporary legal guardian. Thus, it agreed that it was "irrelevant what happened after." The Public Guardian agreed that "[c]learly, the child was neglected while in the custody of" respondent.

¶ 47    In stating its ruling, the court commented this was a "difficult case" because it believed that respondent sought to protect H.C.'s welfare when he appointed Maia as the temporary guardian, and Maia was "doing everything right" in caring for H.C.

¶ 48    However, the court noted its job was to decide whether neglect was proven and that "[a]s of November 15th, [there was] clear neglect." The court commented that the State should have filed its petition at that time, but it had the right to file later. Thus, the court made a "finding by a preponderance of neglect/environment injurious."

¶ 49    The court thus entered a written order finding that the minor was neglected due to an injurious environment under section 2-3(1)(b) of the Act. 705 ILCS 405/2-3(1)(b) (West 2022). The order recited: "Father overdosed on drugs and was found unconscious at home. Mother was not living in the home and whose whereabouts were unknown. Minor was left without care or supervision."

¶ 50                          The Disposition Hearing

¶ 51    The disposition hearing took place on January 15, 2026. The only witness was Cashimere Williams of Lutheran Social Services, who testified that she has been the family's case manager since February 2025. Williams stated that since May 2025, H.C. had resided in the home of her maternal great aunt.

¶ 52    Williams testified that H.C. was now five years old and had been diagnosed with autism. When she became case manager, H.C. was "almost non-verbal" and not potty-trained. However,

H.C. had made significant progress in her great aunt's home. H.C. received occupational therapy, speech therapy, and social work services through her elementary school. She was talking much more and was potty-trained. Williams stated H.C. was thriving and has a "loving bond" with her foster family. Williams visited the home and found it safe and appropriate, with no signs of neglect.

¶ 53    Williams noted that respondent remained incarcerated. H.C.'s mother's whereabouts were unknown, as efforts to contact her were unsuccessful. The mother had not participated in recommended mental health, domestic violence, or drug treatment services.

¶ 54    Williams testified that respondent participated in an integrated assessment and was recommended for various services, but he could not complete all of them due to his incarceration. Williams testified that according to IDOC, respondent's estimated release was in 2029. Respondent was engaged in a substance abuse treatment program while incarcerated, and he indicated his willingness to do all recommended services. Williams testified that respondent desired in-person visits with H.C., and Williams was working to help arrange them.

¶ 55    Williams testified to her opinion that it was in H.C.'s best interests to become a ward of the court and for the DCFS Guardianship Administrator to be appointed guardian.

¶ 56    Following Williams' testimony, the court found that it was "clearly" in H.C.'s best interest to make her a ward of the court and appoint the DCFS Guardianship Administrator, noting the overwhelming evidence that the "child is in a good placement."

¶ 57    On January 15, 2026, the court entered a corresponding written disposition order adjudging H.C. a ward of the court, finding that both mother and respondent were unable for some reason other than financial circumstances alone to care for, protect, train, or direct the minor. The order directed the minor be placed in the custody of the DCFS Guardianship Administrator with the right

to place the minor. By a separate order on the same date, the court vacated the appointment of Maia as H.C.'s guardian.

¶ 58     On January 28, 2026, respondent filed a timely notice of appeal from the adjudication and disposition orders. Respondent filed his opening brief on April 20, 2026, but no other party filed a brief in this appeal. This court elected to take the case on respondent's brief only.

¶ 59                                        ANALYSIS

¶ 60     Although respondent appealed from both the adjudication and disposition orders, the substance of his brief addresses only the adjudication. Specifically, he asserts that the court's finding of neglect was against the manifest weight of the evidence.

¶ 61                          Proceedings Under the Juvenile Court Act

¶ 62     Before we discuss the merits, we briefly review the procedures under the Act. Under the Act, the trial court employs a "two-step process" in determining whether a minor should be removed from parental custody and made a ward of the court. *In re Z.L.*, 2021 IL 126931, ¶ 58. The first step is the adjudicatory hearing, at which "the court shall first consider only the question whether the minor is abused, neglected or dependent." 705 ILCS 405/2-18(1) (West 2022). "The only question to be resolved at an adjudicatory hearing is whether or not a child is neglected, and not whether every parent is neglectful." *In re Arthur H*., 212 Ill. 2d 441, 467 (2004). "[C]ases involving allegations of neglect and adjudication of wardship are *sui generis*, and must be decided on the basis of their unique circumstances." *Id.* at 463. "The cause of the neglect is not relevant at the adjudicatory stage." *In re V.S.,* 2023 IL App (1st) 220817, ¶ 59.

¶ 63     At the adjudicatory hearing, it is the State's "burden to prove allegations of abuse or neglect by a preponderance of the evidence," that is, whether the allegations are more probably true than not. *In re Z.L.*, 2021 IL 126931, ¶ 61. We will not disturb the trial court's finding of abuse or

neglect unless the decision is against the manifest weight of the evidence. *In re K.F.*, 2024 IL App (1st ) 231018, ¶ 53. A finding is against the manifest weight of the evidence "only if the opposite conclusion is clearly evident." *In re Z.L.*, 2021 IL 126931, ¶ 61. "Under the manifest weight standard, an appellate court will affirm the trial court's ruling if there is any basis in the record to support the trial court's findings." *In re V.S.*, 2023 IL App (1st) 220817, ¶ 64 (citing *In re Custody of G.L.*, 2017 IL App (1st) 163171, ¶ 24).

¶ 64    If the trial court determines that a minor is abused or neglected at the adjudicatory hearing, the court proceeds to a dispositional hearing. *In re Z.L.*, 2021 IL 126931, ¶ 60 (citing 705 ILCS 405/2-21(2) (West 2018)). At the dispositional hearing, the court determines "whether it is consistent with the health, safety, and best interests of the minor and the public that the minor be made a ward of the court." *Id.* The court may adjudge the minor a ward of the court if it finds that "(1) the minor's parents are unfit or unable for some reason other than financial circumstances alone, to care for, protect, train or discipline the minor or are unwilling to do so and (2) the health, safety, and best interest of the minor will be jeopardized if the minor remains in the custody of his or her parents." *In re V.S.*, 2023 IL App (1st) 220817, ¶ 63 (citing 705 ILCS 405/2-27(1) (West 2020)). We will reverse a dispositional determination "only if the factual findings are against the manifest weight of the evidence or if the court abused its discretion by selecting an inappropriate dispositional order." *Id.* ¶ 64.

¶ 65    The Court's Finding of Neglect Due to Injurious Environment Was Not Erroneous

¶ 66    Here, respondent's brief challenges the finding that H.C. was neglected due to an injurious environment, pursuant to section 2-3(1)(b) of the Act. 705 ILCS 405/2-3(1)(b) (West 2022) (specifying that "neglected" persons include "any minor under 18 years of age *** whose environment is injurious to the minor's welfare.")

¶ 67 " 'Neglect' is the failure to exercise the level of care that is demanded by the circumstances. [Citations.]" *In re L.S.*, 2022 IL App (1st) 210824, ¶ 127. It has a "fluid meaning that includes willful and intentional disregard of duty and varies based on the context of surrounding circumstances." *Id*. (citing *In re Arthur H*., 212 Ill. 2d at 463). Likewise, the term "injurious environment" is an "amorphous concept that cannot be defined with particularity." *In re Arthur H*., 212 Ill. 2d at 463. "In general, however, the term 'injurious environment' has been interpreted to include the breach of a parent's duty to ensure a safe and nurturing shelter for his or her children." (Internal quotations omitted.) *Id*.

¶ 68 Our supreme court has repeatedly emphasized the " 'fact-driven nature of neglect and injurious environment rulings.' " *In re A.P*., 2012 IL 113875, ¶ 17 (quoting *Arthur H*., 212 Ill. 2d at 463). Cases involving injurious environment allegations "are *sui generis* and 'must be decided on the basis of their unique circumstances." *In re M.D*., 2022 IL App (1st) 220017, ¶ 81 (quoting *In re A.P*., 2012 IL 113875, ¶ 17).

¶ 69 Notably, this court has confirmed that "Evidence that a parent exposed a child to a risk of danger is sufficient" to find an injurious environment, "even if the child has not yet been harmed by the danger." *In re K.F*., 2023 IL App (1st) 220816, ¶ 50 (rejecting appellant's argument that parental drug use is insufficient to find injurious environment absent some additional showing that the drug use negatively impacted the child).

¶ 70 Here, respondent posits that the court's finding of injurious environment was against the manifest weight of the evidence. In doing so, respondent emphasizes the comments by the trial court that praised Maia and indicated that respondent made a "good" decision when he put H.C. in Maia's care, following his November 2024 drug overdose and December 2024 incarceration.

¶ 71   Respondent suggests that the court only found neglect because "it felt duty-bound \*\*\* given [respondent's] neglectfulness on November 15, 2024." According to respondent, the trial court "was satisfied with the care and shelter provided by [respondent]" but "felt constrained to adjudicate the child neglected" due to the "singular episode of neglectfulness on November 15, 2024." Respondent does not dispute that he was neglectful on that particular date, yet he suggests this was not enough for a finding of neglect, given the evidence that H.C. was subsequently cared for.

¶ 72   To be sure, the court expressed that its decision was "difficult" and repeatedly praised Maia's care for H.C. *after* respondent's overdose. Yet, it clearly found that the minor had been neglected at the time that respondent overdosed, when he was the only adult present. Keeping in mind the broad definition of neglect and our deferential standard, we cannot say the finding of injurious environment was against the manifest weight of the evidence.

¶ 73   Importantly, respondent does not dispute the evidence that in November 2024, he overdosed on drugs outside his residence while H.C. (who was only four years old) was inside. Maia's undisputed testimony indicates that this occurred shortly after she left the residence, meaning respondent overdosed on heroin while he was the only adult home to supervise the child. There can be no question that this put H.C. in danger. This is enough to affirm under the governing standard of review, regardless of subsequent conduct. We reiterate that "[u]nder the manifest weight standard, an appellate court will affirm the trial court's ruling if there is any basis in the record to support the trial court's findings." *In re V.S.,* 2023 IL App (1st) 220817, ¶ 64. There was certainly a basis to find neglect as of the November 2024 overdose, regardless of whether respondent and Maia subsequently arranged proper care for H.C.

¶ 74    In suggesting that his November 2024 overdose was not enough to find neglect, respondent points out this court's recognition that "isolated incidents of a parent's drug use do not necessarily pose a danger to a child" for finding neglect. See *In re K.F.*, 2023 IL App (1st) 220816, ¶¶ 68-69 (trial court's findings of injurious environment were supported by evidence of mother's "ongoing pattern of substance abuse"); *In re K.E.-K.*, 2018 IL App (3d) 180026, ¶ 16 (" '[a]lthough isolated incidents of a parent's drug usage do not necessarily pose a danger to a child [citation,] obviously an ongoing pattern of substance abuse can create an injurious environment.' " (quoting *In re Z.Z.*, 312 Ill. App. 3d 800, 805 (2000)).

¶ 75    It is true that an isolated instance of parental drug use does *not necessarily* support a finding that the child was put in an injurious environment, depending on the circumstances. For instance, we could hypothesize situations where a child might be found to be properly supervised and cared for by another responsible adult, even if one parent was using illegal drugs. But respondent's reliance on this proposition is unavailing under the facts of this case. Here there is undisputed evidence that respondent overdosed on heroin in front of his residence while his four-year-old was sleeping alone inside. Respondent was found passed out and needed Narcan to be revived. Fortunately, H.C. was unharmed by this incident. Yet, the trial court could reasonably find that H.C. was endangered in that situation, constituting an injurious environment. That is, it could certainly find that respondent had breached his parental "duty to ensure a safe and nurturing shelter" for H.C.  See *In re Arthur H.*, 212 Ill.2d at 463. This is true, wholly independent of whether Maia subsequently provided good care for H.C. after respondent's incarceration.

¶ 76    To be sure, we recognize the trial court's frustration that the State did not act sooner in this case. We also recognize there is no evidence that Maia failed to provide adequate care for H.C. after she was appointed temporary legal guardian. However, there was certainly evidence from

which the court reasonably found that H.C. was neglected at the time of respondent's overdose. We simply cannot say the finding of injurious environment was against the manifest weight of the evidence.

¶ 77                    The Dispositional Findings Were Not Erroneous

¶ 78    We briefly note that respondent's notice of appeal also referenced the January 2026 dispositional order finding respondent unfit and unable to care for the H.C. and making the child a ward of the court. However, his brief makes no argument challenging the trial court's dispositional findings and determination. Thus, his challenge to that order is forfeited. See Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020) ("Points not argued [in an opening brief] are forfeited and shall not be raised in a reply brief, in oral argument, or on petition for rehearing.")  In any event, there are no grounds to disturb the dispositional order. At the dispositional hearing, the trial court's inquiry is "whether it is consistent with the health, safety, and best interests of the minor and the public that the minor be made a ward of the court." *In re A.P.*, 2012 IL 113875, ¶ 21 (citing 705 ILCS 405/2-21(2) (West 2010)). Further, for the court to order a minor to DCFS custody, the State must show by a preponderance of the evidence that a parent is unable to care for, protect, train, or discipline the minor. *In re Daniel G.,* 2012 IL App (1st) 210640, ¶ 58. The "dispositional order will be reversed only if the factual findings *** are against the manifest weight of the evidence or if the court abused its discretion by selecting an inappropriate dispositional order." *Id.* ¶ 54.

¶ 79    Here, there was uncontradicted testimony that H.C. was thriving in her placement with her maternal great aunt, where she was loved and receiving all necessary services to address her needs. On the other hand, respondent remained incarcerated (which prevented him from addressing recommended services) and the natural mother could not be located. Thus, we cannot say the court

erred in finding the parents unable to care for H.C., and that it was in her best interests to be made a ward of the court.

¶ 80                                    CONCLUSION

¶ 81    For the foregoing reasons, the judgment of the Circuit Court of Cook County is affirmed.

¶ 82    Affirmed.